John E. Stirling and Elizabeth K. Stirling v. Commissioner. John P. Horton and Jean A. Horton v. Commissioner.
Stirling v. Commissioner
Docket Nos. 259-68, 260-68.
United States Tax Court
T.C. Memo 1970-49; 1970 Tax Ct. Memo LEXIS 311; 29 T.C.M. (CCH) 215; T.C.M. (RIA) 70049; February 24, 1970, Filed *311 Arthur L. Nims, III and Charles R. Merrill, 550 Broad St., Newark, N. J., for the petitioners. Aleksandrs V. Laurins, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined the following income tax deficiencies for the calendar year 1963 in these consolidated cases: Petitioners
Docket
Deficiency
John E. and Elizabeth K. Stirling
259-68
$83,843.46
John P. and Jean A. Horton
260-68
Certain issues involving small amounts of these deficiencies have been conceded by the parties. Thus the only issue remaining for our decision in these consolidated cases is whether or not an advance in the form of a loan of $250,000 from one corporation, almost all of whose stock was held by petitioners, to another corporation, 50 percent of whose stock was simultaneously purchased by petitioners with funds of their own, resulted in a constructive dividend to petitioners from the corporation making the advance. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Petitioners, John E. Stirling and Elizabeth K. *312 Stirling, are husband and wife residing in Westfield, New Jersey. Petitioners, John P. Horton and Jean A. Horton, are husband and wife residing in Bernardsville, New Jersey. Elizabeth K. Stirling and Jean A. Horton are parties in this case solely by reason of having filed joint income tax returns in 1963 with their respective husbands. These joint returns were filed with the district director of internal revenue, Newark, New Jersey. The term "petitioners," when used hereafter will refer to Messrs. [1] Stirling and Horton. Newark Brush Company (sometimes hereinafter referred to as "NBC") was organized 216 in 1904 under the laws of the State of New Jersey. Since its incorporation, NBC has been engaged in the manufacture and distribution of various types of industrial and road sweeping brushes. Originally its marketing territory was that part of the United States north of Washington and east of Chicago. Later it expanded its operations so as to cover the entire country and extended its sales operations into Canada by means of licensing arrangements. Throughout 1963, the taxable year *313 in question, and at all relevant times thereafter, the capital of NBC has consisted of 30,000 shares of 6 percent cumulative nonvoting preferred stock, par value $10 per share, and 1,000 shares of common stock having a par value of $10 per share. Throughout 1963 the stock of NBC was held as follows: *10 Preferred Stock
Stockholder
No. of Shares
Ruth E. Stirling
14,340
John E. Stirling
6,810
John P. Horton
1,290
Jean Ann Horton
960
John P. Horton and John E. Stirling, trustees for John P. Horton, Jr
600
John P. Horton and John E. Stirling, trustees for Peter Horton
600
John P. Horton and John E. Stirling, trustees for Sarah Horton
600
John P. Horton and John E. Stirling, trustees for Elizabeth Lynn Stirling
600
John P. Horton and John E. Stirling, trustees for Karen Stirling
600
John P. Horton and John E. Stirling, trustees for Susan Stirling
600
Mary S. Campbell, custodian for William H. Campbell, IV
600
Mary S. Campbell, custodian for Cynthia E. Campbell
600
Mary S. Campbell, custodian for Nancy E. Campbell
600
Mary S. Campbell, custodian for Linda S. Campbell
600
Mary S. Campbell, custodian for Frederick S. Campbell 600
Total
30,000
*314 *10 Common Stock
Stockholder
No. of Shares
Jean Ann Horton
12
John P. Horton
486
John E. Stirling
497
Ruth E. Stirling
1
Edgar M. Buttenheim
1
Edward Dreyer
1
Robert Hoffman
1
Burr Williamson 1
Total
1,000
Ruth E. Stirling is the mother of John E. Stirling, Jean Ann Horton and Mary S. Campbell and is the widow of the person controlling NBC prior to his death in 1957. During 1963 and at all relevant times thereafter, the one share each of common stock held, respectively, by Edgar M. Buttenheim and Edward Dreyer were held by them as nominees for John E. Stirling, and the one share each of common stock held, respectively, by Robert Hoffman and Burr Williamson were held by them as nominees for John P. Horton. At all times relevant to this case the Board of Directors of NBC consisted of the following named persons: John P. Horton, John E. Stirling, Ruth E. Stirling, Burr Williamson, Edgar M. Buttenheim, Edward Dreyer and Robert Hoffman. Throughout 1963 John E. Stirling was president of NBC, John P. Horton was vicepresident, and Ruth E. Stirling was secretary and treasurer. Stirling and Horton were officers and the principal *315 shareholders of Danline Manufacturing Company (hereinafter sometimes referred to as "Danline"), a New Jersey corporation located at the same address as NBC in Kenilworth, New Jersey. In 1962, the petitioners, convinced that the European brush market offered an excellent field in which to expand and develop new markets for its products, became interested in acquiring a brush manufacturing business in Europe. In the latter part of 1962 the petitioners and George Berry, chief engineer of NBC, went to Europe and investigated several brush companies in Germany which, they believed, might be available for purchase at that time. They also explored with British Ropes Limited (hereinafter sometimes referred to as "British Ropes"), a wire manufacturing company in England from which NBC had purchased wire for its "municipal brushes," the possibility of establishing a joint venture corporation to manufacture brushes in Europe, to be owned 50 percent by NBC or Danline and 50 percent by British Ropes. In late 1962 or early 1963, Horton was advised that it might be possible to acquire I/S [2] Borstefabriken "Dan," a Danish brush manufacturer located near Kolding, Denmark, which at that time was *316 being operated as a partnership by two brothers, Edward Nielsen and Albert Nielsen. The Danish company was of particular interest to the petitioners because of their prior 217 acquaintanceship with Edward Nielsen, the older of the two brothers, who had at one time been the part owner of NBC. Although the relationship between NBC and the Nielsens had been strained for a few years, business transactions had continued between them since the Danish partnership manufactured many of the same types of products as NBC. In 1958 the two Nielsen brothers had visited America and had talked with petitioners about a new type of road sweeping brush which they licensed NBC to sell. British Ropes was interested in preventing the acquisition of I/S Borstefabriken "Dan" by a German Cartel which was at that time the subject of a rumor circulated in international brush circles. In the spring of 1963, the petitioners went to Europe and met with the Nielsens, at which time they discussed the possible purchase of their business. On April 25, 1963, the *317 petitioners and the Nielsens signed a Memorandum of Agreement wherein the Nielsens offered to sell their interest in the partnership I/S Borstefabriken "Dan" "to John Stirling or John Horton or their companies," with a proviso that Albert Nielsen would stay on as general manager. The Memorandum of Agreement stated that the offer price was to be the sum of 400,000 Danish Kroner plus ten times the partnership's average annual return of the prior five years, before taxes, or slightly in excess of $1,217,300. The Board of Directors of NBC held its regular quarterly meeting on May 16, 1963, at which time Horton advised the board as to developments in connection with the proposed European venture. Among the matters discussed at the meeting was the offer price for the Nielsen partnership contained in the Memorandum of Agreement which, because it was based on pre-tax earnings, appeared to the NBC Board of Directors to be too high. At the conclusion of the meeting it was the consensus of the board that further investigation of the prospects of acquiring a manufacturing business in Europe should be pursued. NBC thereafter retained Peat, Marwick and Bohlins, Certified Public Accountants, *318 of Stockholm, Sweden, to examine the books of the partnership, and, on May 20, 1963, that firm submitted a preliminary report on the financial condition of the partnership. In addition, Poul Parkegaard, a Danish "State Authorized Public Accountant" and the accountant for the Nielsens, submitted a summary showing the turnover and profits history of the partnership for the years 1953 through 1962, inclusive. Petitioners submitted both of these documents to R. R. Mandel, senior partner of NBC's firm of Certified Public Accountants, for his analysis and advice. Following the May 16, 1963 meeting, Horton returned to Europe and entered into further negotiations with Albert and Edward Nielsen. During these negotiations the Nielsens and Horton went through the partnership's plant and placed a value on every piece of equipment. During these negotiations Horton attempted, with success, to get the Nielsens to agree to a valuation of the partnership in an amount lower than the offer price contained in the original Memorandum of Agreement. In early June, 1963, Horton first visited I.A. Strobel, a Danish tax lawyer, in his offices in Copenhagen. Strobel was first introduced to Albert Nielsen *319 by Horton in Strobel's office in the middle of June, at which time a proposed acquisition was discussed. Strobel had not previously known the Nielsens, nor had he known the identity of their company. At this time, the concept of the acquisition of the Danish company was changed. Albert, who had been actually operating the business, decided to retain his interest. British Ropes, upon learning that only a 50 percent interest could be acquired (which would have had to be held jointly with NBC), and being satisfied that the acquisition by petitioners of their corporation of a 50 percent interest would prevent their customer I/S Borstefabriken "Dan" from falling into the control of the German Cartel, declined to participate. This proved agreeable to petitioners, who had never in fact disclosed to the Nielsens their involvement with British Ropes. Another change in the concept of the acquisition was that Horton and Stirling decided that they, rather than NBC or Danline, would acquire Edward's 50 percent interest in equal parts. A final decision to form a limited liability company was made after Horton had conferred with Edward Nielsen, Albert Nielsen, Strobel and Parkegaard, who suggested *320 the form in which the capitalization of the corporation was ultimately cast. It was also agreed that a net value of approximately $700,000 was to be placed upon the assets of the Danish partnership to be transferred to the limited liability company and that Edward Nielsen was to be paid approximately $350,000 for his half of the company 218 of which $70,000 was to be paid in cash and the balance of $280,000 in notes. After the Nielsens agreed upon terms, Strobel did, in fact, commence the formation of a limited liability company known as A/S Borstefabriken DAN (hereinafter referred to as "DAN") which ultimately succeeded to the business of the partnership. Subsequent to reaching these agreements with the Nielsens, Horton canvassed various possibilities for financing the transaction. He learned that borrowing from a bank in Denmark was impossible because of the disinclination of Danish banks to make loans to newly organized corporations. Edward Nielsen offered to lend petitioners 1.000.000 Danish Kroner (about $145,000) for four years at 8 percent interest and signed a memorandum to that effect. Massachusetts Mutual Life Insurance Company and The Prudential Insurance Company of *321 America were further available sources of funds. Petitioners ultimately decided to arrange the financing through Fidelity Union Trust Company, Newark, New Jersey, hereinafter referred to as "Fidelity," which was NBC's commercial banking connection. Fidelity was willing to lend NBC $250,000 with the understanding that this amount was to be loaned to DAN, which would in turn retire $250,000 worth of the notes in the principal amount of $280,000 payable to Edward Nielsen leaving him holding $30,000 of such notes. Fidelity agreed to a 5-year, 5 i/2 percent loan, amortized, however, on a 10-year basis, with a $125,000 unpaid balance at the end of the first 5 years. The Fidelity loan was to be secured by a first mortgage on NBC's real estate and was to be guaranteed by the endorsements of Stirling, Horton and Danline. The ultimate loan agreement between NBC and Fidelity contained no prepayment penalty, as would have been required by the insurance companies. Prior to approving the loan to NBC, Fidelity was furnished on July 10, 1963, with the financial analysis of I/S Borstefabriken "Dan" prepared by Messrs. Peat, Marwick and Bohlins, covering the years 1961 and 1962. The bank, in turn, *322 made its own analysis of the partnership on the basis of the Peat, Marwick and Bohlins statement. The arrangements for the Fidelity loan were completed, and the note signed, on September 5, 1963; and the $250,000 proceeds were deposited in NBC's checking account with Fidelity on September 6, 1963. As of September 10, 1968, NBC had paid off $125,000 of its obligation to Fidelity in accordance with the terms of its loan agreement with Fidelity. The remaining "balloon" then due was renegotiated on an additional 5-year basis, with interest at i/2 of 1 percent above prime, with a 7 i/2 percent ceiling and a 5 i/2 percent floor. Fidelity agreed to release its collateral and to accept the endorsement of only Danline as guarantor in connection with the renegotiated loan. Horton presented the final plan to acquire an interest in the Danish partnership to the NBC board for its consideration at its regular quarterly meeting held on August 1, 1963. The meeting was attended by six of the seven directors (Ruth Stirling being absent), as well as by the company's attorney and its auditor. The presentation was made in part in the form of a lengthly memorandum prepared by Horton entitled "Recommendation *323 for Approval: Agreement with Borstefabriken 'DAN'," which contained a detailed description of the proposed transaction and to which was attached comprehensive statistical data, including sales, profits and cash-flow projections. Horton also made a verbal presentation. The purpose of the above-mentioned memorandum was to lay the whole picture regarding the DAN matter before the board to that the board members could come to a proper business judgment in the matter of extending a loan to DAN and of authorizing the NBC officers to negotiate the loan from Fidelity. The minutes of the August 1 meeting recite the following alleged business reasons why the loan to DAN would be advantageous to NBC: (1) It would assure NBC of a source of inexpensive "Do-It-Yourself" brushes which the company once marketed in the United States, but could no longer do competitively. (2) It would provide NBC with a good source of hand scratch brushes which are an important item in the industrial distribution marketing channel which NBC was about to enter. (3) It would give NBC access to certain patents, trade secrets and manufacturing know-how not then presently available to the company with respect *324 to road sweeping brushes. 219 (4) The Denmark company had developed certain techniques for the manufacture of sisal buffs which appeared attractive to NBC as a source of diversification. (5) NBC would realize some income from its loan. The NBC Board of Directors was also aware that the major purposes of the proposed loan were to assist petitioners in their acquisition of a 50 percent equity interest in DAN, and to prevent DAN from being short of working capital after DAN made payments to Edward Nielsen retiring his notes and to allow DAN to purchase certain equipment with which it could manufacture certain brushes which would be desirable for NBC to import. The NBC board approved the loan to DAN with the provisos that (a) the Fidelity loan be negotiated substantially on the terms outlined by the officers; (b) the consent of the common stockholders other than Horton and Stirling be obtained; (c) the NBC certificate of incorporation be amended to authorize the company to lend money; (d) Horton and Stirling assign their DAN stock to NBC to secure the loan; and (e) the loan to DAN be in an amount not greater than $300,000. It was also the board's consensus that Horton and Stirling *325 should enter into a stock purchase agreement with Albert Nielsen so that the DAN stock would not fall into the hands of strangers. All of the provisos except proviso (e) were complied with. [3]
It was Horton's judgment that if he and Stirling concentrated on improving the marketing techniques of the Danish company, it could increase its sales. In his Memorandum to the Board, Horton projected DAN sales through 1968 at a level which he thought would be optimal and also illustrated that DAN would have ample resources with which to meet its loan repayment commitments if only one-half of the projected optimal sales increases were attained. He also projected cash flow on the "full sales increase" and the "half sales increase" *326 basis. As of the trial date, both sales and cash flow actually achieved were somewhat greater than Horton's half-sales projections. In 1963 Danish fiscal regulations required prospective foreign investors in Danish companies to obtain permits, both as to the acquisition of shares in, and the making of loans to, Danish companies. The purpose of the regulations was to protect the Danish balance of payments against foreign speculators. The Danish fiscal authorities had to be convinced that the applicant intended to make a long-term commitment in a legitimate business and not merely to place "hot money" in Denmark on a short-term basis at the then prevailing interest rates, which were 8 or 9 percent. In addition to the formal documents required under Danish law, an Agreement to Form Corporation was entered into by Albert, Edward, Esther Nielsen (Albert's wife, who owned a small number of qualifying shares), Stirling, Horton, Danline and NBC, which formalized the understanding between the parties. This agreement was the joint effort of petitioners' United States counsel and Strobel. For Danish tax purposes, the incorporation of the former partnership was treated as a sale, resulting *327 in a tax liability against Albert Nielsen of approximately Kr. 700.000,00 (about $100,000). Under Danish law, it would not have been possible for Albert to have obtained money with which to pay his taxes at the time they were due by way of a dividend from DAN. Consequently, there had to be a debt to Albert in an amount at least equal to his Kr. 700.000,00 tax liability. In the Agreement to Form Corporation, Stirling and Horton jointly and severally guaranteed that DAN would have funds available to pay Kr. 700.000,00 of Albert's debt on the due dates on which Albert was to make installment payments of his tax liability. Stirling and Horton also jointly and severally guaranteed that DAN would have funds available to pay Edward Nielsen all of the debt due to him from DAN not later than March 20, 1964. Edward Nielsen also agreed to sell to Stirling and Horton all of his stock in DAN at a time not later than the same date. The Memorandum of Association provided that the newly formed corporation (DAN) would recompense the partners for their partnership assets in the following manner. [4]
*328 220 By issue of shares amounting to
Kr. 999.500,00
$155,436.42
By assuming mortgages and other liabilities
655.211,56
94,683.75
By cash payment of
500,00
72.25
By debt from the company to the former owners 3.690.192,74
533,264.85
Total
Kr. 5.345.404,30
$772,457.27
The Memorandum of Association further provided the following schedule of debt repayment to the former partners (with interest at 6 percent per annum): (1) To Edward Nielsen: the entire amount - Kr. 1.879.602,42 [$271,618.85] not later than March 20, 1964. (2) To Albert Nielsen: (a) Kr. 125.000,00 [$18,063.58] before the end of 1963. (b) Kr. 575.000,00 [$83,092.49] by installments corresponding to the installments and days of payment of his personal tax in the tax years 1964/1965. (c) Kr. 150.000,00 [$21,676.30] before the end of 1966. (d) Kr. 250.000,00 [$36,127.17] before the end of each of the years 1967, 1968, and 1969. (e) Kr. 210.590,32 [$30,432.13] before the end of 1970. The Nielsens and petitioners agreed that petitioners would share the profits of the company from September 1, 1963. Because of the necessary formalities to be complied with, the corporation *329 was not actually formed as of September 1, 1963. However an opening balance sheet was prepared as of the September 1 date. The Articles of Association of DAN provided for two different classes of stock: A and B. The DAN Board of Directors consisted of six members and the two classes of stock were created so as to permit the American shareholders to elect three board members and the Danish shareholders to elect three members. Except with respect to this matter, the two classes of shares were identical. The "A" shares were initially issued to Edward and then transferred by him to petitioners. Both classes of shares had to be represented at board meetings in order for there to be a quorum. The original directors of DAN were Horton, Stirling and Strobel, elected by the American shareholders, and Albert, Esther Nielsen and Udall Juhl, Albert's lawyer, elected by the Danish shareholders. The formation meeting of DAN was held on November 14, 1963, at which the Memorandum of Association, Articles of Association and statement of costs were adopted. From this point until February 11, 1964, when registration was completed DAN operated provisionally as a "company under formation." In the *330 middle of August 1963, Stirling returned to Denmark and remained there until December of that year. When the proceeds of the Fidelity loan became available, Horton mailed a check in the amount of $250,000 to Stirling. Horton also forwarded additional checks totaling $72,390, representing funds belonging to Horton and Stirling and obtained by them from sources other than NBC, the proceeds of which were to be used by Horton and Stirling to purchase Edward's DAN stock when it was issued to him. At no time did Stirling consider any of these funds to be his own personal money, with the exception, of course, of the half of $72,390 which he planned to use to purchase his half of Edward's stock. As of September 12, 1963, Stirling had received all of the foregoing checks, totaling $322,390, which on September 20, 1963, he deposited in an account in the Landmandsbank, Kolding, Denmark. On September 20, 1963, Stirling, Edward and Albert signed a memorandum recognizing that Stirling had placed the kroner equivalent of $322,170 in the Landmandsbank, Kolding, to be used by NBC, Stirling and Horton to fund the transaction. On December 9, 1963, Albert, his wife, Esther, and Edward executed and delivered *331 to Stirling on behalf of DAN (described as "at present under formation") a Kr. 1.725.000 (approximately $250,000) demand promissory note in favor of NBC. On December 17, 1963, Stirling sent a letter of instructions to the Landmandsbank advising it that out of the Kr. 2.223.080,54 ($322,170) on deposit in his name, Kr. 1.725.000,00, plus interest, was to be released to DAN upon certain conditions, and the remaining Kr. 498.080,54 plus interest was to be released to Strobel upon certain conditions. 221 By letter of January 14, 1964, the National Bank, on its own behalf and on behalf of the Ministry of Commerce, approved the borrowing by DAN from NBC. The letter including the following: (2) The National Bank permission for the company to borrow Kr. 1.750.000 from Newark Brush Company to be amended to allow two loans, respectively Kr. 1.110.590,32 and $111,335.82 to be repaid in the following manner: 1966
kr. 150.000,00
1967
kr. 250.000,00
1968
kr. 250.000,00
1969
kr. 250.000,00
1970
kr. 210.590,32
$ 5,705.65
1971
36,194.43
1972
36,194.43
1973 33,241.31
kr. 1.100.590,32
$111,335.82
On March 14, 1964, DAN duly executed a Loan *332 Agreement to NBC, constituting the definitive debt obligation between the two companies. The agreement provided, in addition to numerous covenants and warranties, that the loan is secured by mortgages on DAN's real estate, that "Newark and Mr. Albert Nielsen will participate in this security in proportion to their respective unpaid balances of principal" and that "Newark will have security in common with Mr. Albert Nielsen in the plant and other equipment, and in the outstanding accounts of the Borrower, and in its inventory." The agreement also limited further borrowing by DAN, but this provision was to cease to operate when so much of this loan has been repaid that the remainder is covered by the real property mortgage documents. In addition, the loan agreement provided that "in consideration for the granting of the loan covered by this Loan Agreement" DAN would: (a) Make available certain 3 and 4 inch brushes at a price competitive with other European sources. (b) Not sell to other distributors in the United States so long as its production facilities were not capable of producing more than the requirements of NBC's customers. (c) Provide NBC with a source of hand scratch *333 brushes at a price competitive with other European manufacturers. (d) Instruct NBC in the methods of manufacturing sisal buffs. (e) Make available to NBC, against a royalty to be agreed upon by the parties, all patent protection obtained under a patent applied for covering side brooms. The mortgage documents securing the loan from NBC to DAN were made a matter of record with the Public Registrar. The amount of the mortgages corresponded more or less to the official valuation for land tax purposes, and covered about one-half of the total loans made to NBC and Albert. Strobel advised this as a conservative approach. He also advised against a formal pledge of the equipment and other movable property, which would have created a bad impression on DAN's other creditors. On March 18, 1964, Stirling advised the Landmandsbank to release Kr. 1.725.000 to DAN and the balance to Strobel, both in accordance with his prior letter of December 17, 1963. On March 25, 1964, Strobel advised NBC, c/o Horton, that "the loan to DAN was completed on March 23rd by payment to Mr. Edward Nielsen of kr. 1.932.141,49 and to DAN of kr. 11.054,13." On the same date Strobel advised Horton and Stirling by *334 separate letters that Edward received payment for the stock including the required interest. The total amount received by Edward for his stock and notes was about $343,870 plus about $11,630 in interest. The first payment of principal was not required under the loan agreement between NBC and DAN until December 31, 1966, because DAN first had to furnish Albert with his Kr. 700.000,00 tax money. Thereafter DAN was to start repayment on both Albert's loan and the NBC loan in parallel installments. The provision for the repayment by DAN of the loan from NBC to be made partly in kroner and partly in U.S. dollars was the result of a compromise reached between the taxpayers and Albert. The first Kr. 700.000,00 due to Albert had to be paid before any repayment to NBC, so that Albert could pay his Danish income tax. Since NBC agreed to this concession, Albert agreed that after the "parallel" installments of kroner to Albert and NBC through 1969 and the "parallel" installment of kroner in 1970 had been completed, the balance of the amount due to NBC would be paid off in U.S. dollars. The exchange rate changed from approximately 6.9 to approximately 7.5 Danish Kroner per dollar in late 1967, *335 creating an anticipated loss to NBC on its loan of approximately $11,200.00 in principal payments. The interest was paid by DAN to NBC annually, when due, from the inception of the loan, pursuant to the terms of the loan agreement. Up until the time of trial, all payments of principal due under the 222 agreement have also been paid by DAN to NBC when due. Stirling and Horton executed on June 30, 1964, a buy-sell agreement for their respective shares of stock in DAN containing the following terms: (1) each had first option to purchase the other's shares; (2) the agreement was to be binding on all assignees; (3) the price during the year 1964 was fixed at $30 per share ($30 x 2500 shares = $75,000 for each party's interest, total agreed value - $150,000); and (4) after 1964 the price share of DAN stock was to be set periodically by mutual agreement of the parties. Since 1960, when its preferred stock was created, NBC has paid an annual dividend on the stock of $18,000, none of which dividends are in arrears. As of the date of trial, NBC had never formally declared and paid dividends on its common stock. NBC had available earnings and profits for its fiscal years ended March 31, 1963 and *336 March 31, 1964, as follows: Year
Amount
3/31/63
$242,057
3/31/64
238,838
Albert, Strobel, the Danish fiscal authorities, the NBC Board of Directors and the petitioners all intended that DAN would repay the advances from NBC. There was every reasonable expectation that the advances would be repaid and repayments have been made when due. Petitioners did not receive a constructive dividend from NBC during their 1963 taxable years. Opinion KERN, Judge: Respondent's argument in support of his determination that petitioners received dividend income in 1963 from Newark Brush Company is divided into three points. The first is that the $250,000 purportedly advanced by NBC to the Danish corporation DAN was in reality paid by NBC to Edward Nielsen in part payment for his interest in DAN purchased from him by petitioners, DAN being merely a conduit in the transaction. The second point is that even though the $250,000 advanced by NBC to DAN became a part of its assets, the advance should not be considered as a loan giving rise to a debt owed by DAN to NBC but should be considered to be a contribution of capital by NBC (a corporation controlled by petitioners) to DAN *337 (a corporation eventually controlled by petitioners and Albert Nielsen) and therefore should be considered as a constructive dividend to petitioners. As an alternative to these two points, respondent makes a third point, raised for the first time on brief. This third contention is stated by respondent as follows: But whether or not the advance by NBC to DAN is regarded as a bona fide loan, it is respondent's position that a constructive dividend distribution, in the approximate amount determined in the deficiency notices, took place when NBC permitted the petitioners to exercise the right to purchase Edward Nielsen's DAN stock at a price equivalent to a small fraction of its fair market value. This valuable stock purchase right was analogous to a loan placement fee and therefore clearly belonged, as a matter of economic reality, to the corporate lender that risked its capital to acquire that right. When NBC surrendered the profit inherent in the exercise of that right to its controlling shareholders, the tax consequence was a constructive dividend in the amount of the difference between the $70,000 "option" price and the stock's fair market value. With regard to the first point *338 respondent urges that "[in] substance the $250,000 went from NBC to petitioners and from petitioners to Edward Nielsen," that it was not a loan from NBC to DAN and never became a part of DAN's operating assets. Therefore respondent would have us view the transaction as being in substance merely the withdrawal by petitioners of $250,000 from their controlled corporation, NBC, for their use in purchasing Edward Nielsen's interest in DAN. In our opinion this interpretation of the transaction ignores reality rather than achieves it. Respondent concedes that "the legal formalities for creating a loan between NBC and DAN were meticulously followed." DAN received the money from NBC and executed its notes payable to NBC evidencing its obligation to repay this money to NBC at certain times with appropriate interest. It was the intent of all the parties involved that DAN would repay this money to NBC according to the terms of the notes. Payments of interest and repayments of principal were in fact made by DAN to NBC when such payments were due. Under these circumstances, it would seem to us highly imaginary and unreal to conclude that in reality DAN received no funds from NBC which "became *339 a part of its assets" because of the alleged reason that DAN used the borrowed money to pay a debt which it owed to Edward Nielsen incurred 223 in connection with its acquisition of its assets from Edward and his brother and because Edward was unwilling to make any transfer of its stock owned by him before this debt was paid. None of the cases cited by respondent on this point sustains his argument. With regard to the second point of respondent's argument, respondent contends that, although "petitioners meticulously cast the $250,000 advance in the form of a loan from NBC to DAN," the advance was not "made with a reasonable expectation of repayment regardless of the success of the venture" but, to the contrary, was "placed at the risk of the business," that "no outside lender would have made a similar advance," and that there was "complete disregard of customary creditor safeguards" largely because of the failure of NBC to obtain adequate security from DAN for the repayment of this advance. Respondent would have us conclude that the advance did not give rise to a debt owed by DAN to NBC but instead represented a capital contribution which petitioners caused their controlled corporation, *340 NBC, to make to DAN, "a Danish corporation in which they were purchasing a 50% interest," and therefore should be considered as a dividend distribution from NBC to petitioners. Since it is our opinion that the record herein establishes that all of the parties concerned with the advance by NBC to DAN intended and reasonably expected the advance to be repaid with appropriate interest in a reasonable time, that payments of interest and repayments of principal have been made therein when due, that other investors (e.g., Edward Nielsen) would have made an advance similar to the one made by NBC, and that creditor safeguards were taken which were reasonable under the facts here present, [5] we conclude that the advance by NBC to DAN constituted a loan rather than a contribution to capital. Accordingly the second point of respondent's argument is no more persuasive than his first point. *341 Respondent's third point of argument, made as an alternative and advanced for the first time on brief, has been stated by us above, in the form of a quotation from "Points Relied Upon" in respondent's brief. Later in the same brief he states his argument on this point as follows: It is respondent's position that the $250,000 advance did not represent a bona fide loan. However, even if the advance by NBC to DAN could be regarded as a bona fide loan, it is obvious that NBC received consideration in addition to DAN's promise to repay at 6% interest. The additional consideration was the right to purchase Edward Nielsen's 50% stock interest at a fraction of its fair market value. In effect this right was distributed by NBC to its shareholders, the petitioners, and it is the value of this right which must be regarded as a constructive dividend. He continues his argument by contending that the difference between the fair market value of the stock of DAN acquired by petitioners and the price which they paid for it was $305,000 and accordingly, that "the amount of the constructive dividend to petitioners would be $305,000, or $55,000 greater than the amounts determined by respondent in *342 the statutory notices of deficiency." As we have pointed out, no reference was made to the theory of this argument in the determinations of deficiency, in any of the pleadings, in any statement by counsel at the trial of this case or in any question asked or answer given at such trial. Assuming arguendo that it may be considered by us, it is our opinion that it is not supported by the facts proven herein especially if, as respondent concedes for the purpose of this argument and as we have found, "the advance by NBC to DAN [should] be regarded as a bona fide loan." Respondent urges us to make conclusions as to values based upon isolated bits of testimony which were not and could not be relevant to questions relevant to this argument which were not before us at the trial. Although this argument may be characterized as ingenious we must conclude that on the record before us it is without merit. We decide the issue before us in each case, i.e., whether petitioners received a constructive dividend in 1963 as a result of the transactions herein described, for the petitioners. Decision will be entered under Rule 50 in docket No. 259-68. Decision will be entered for petitioners in *343 docket No. 260-68. 224 Footnotes
1. Petitioner John P. Horton holds the degree of Doctor of Sanitary Engineering from M.I.T.↩
2. The use of these letters "I/S" preceding the name of a Danish business entity indicates that the business is being carried on as a partnership.↩
3. As of March 31, 1965, DAN owed NBC a total sum slightly in excess of $300,000 resulting from several small short-term loans made by NBC during the year prior to that date for the purpose of permitting DAN to buy new equipment and ease stringencies on working capital. These small loans were paid in full during the following year. The total sum of the loans made by NBC to DAN was never in excess of the $350,000 limitation placed upon such loans by Fidelity.↩
4. The exact exchange rate for dollars and Danish Kroner at the time DAN was incorporated is not disclosed in the record, though there is testimony that the exchange rate was approximately 6.9 Danish Kroner to one dollar. On brief in several of their requested findings of fact, petitioners utilize an exchange rate of 6.92 Danish Kroner to one dollar mentioned at the trial of these cases by petitioner Horton. Respondent raised no objections to the use of that exchange rate in his reply brief. We therefore accept that exchange rate as a fact for purposes of this case.↩
5. In this connection we point out that respondent's suggestion under this point of his argument that the solvency of DAN was questionable when the advance was made and therefore common prudence required the mortgage or pledge of tangible assets having a value at forced sale in excess of the amount of the advance to secure it is inherently inconsistent with his third alternative point of argument.↩